# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE BAKER HUGHES INCORPORATED MERGER LITIGATION | ) ) ) ) | C.A. No. 2019-0638-AGB |

## MEMORANDUM OPINION

Date Submitted: July 16, 2020
Date Decided: October 27, 2020

Ned Weinberger and Thomas Curry, LABATON SUCHAROW LLP, Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Thomas A. Uebler, Joseph L. Christensen, and Hayley M. Lenahan, MCCOLLOM D'EMLIIO SMITH UEBLER LLC, Wilmington, Delaware; Jeroen van Kwawegen, Edward G. Timlin, and Alla Zayenchik, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Frank R. Schirripa and Kurt Hunciker, HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York; *Attorneys for Plaintiffs.*

Kevin R. Shannon, Matthew F. Davis, and Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Samuel W. Cooper, PAUL HASTINGS LLP, Houston, Texas; Edward Han, PAUL HASTINGS LLP, Palo Alto, California; *Attorneys for Defendants Martin S. Craighead and Kimberly Ross.*

Michael P. Kelly, Andrew S. Dupre, and Sarah E. Delia, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Alan S. Goudiss, Paula H. Anderson, and Grace J. Lee, SHEARMAN & STERLING LLP, New York, New York; *Attorneys for Defendant General Electric Company.*

**BOUCHARD, Chancellor**

This case concerns the July 2017 merger of Baker Hughes Incorporated, an oil field services provider, and the oil and gas segment of the General Electric Company ("GE O&G"). After the merger, General Electric owned 62.5% of the combined entity and Baker Hughes stockholders owned the remaining 37.5%. The Baker Hughes stockholders also received a $7.4 billion cash dividend in connection with the merger.

When the transaction was negotiated in the fall of 2016, GE O&G reported its results on a consolidated basis as part of General Electric and did not have separate audited financial statements. During the negotiations, General Electric provided Baker Hughes with unaudited financial statements and management projections for GE O&G. In the merger agreement, the parties conditioned the closing on Baker Hughes' receipt of audited financial statements for GE O&G. They also agreed that Baker Hughes would have the right to terminate the merger if the audited financial statements differed from the unaudited financial statements in a manner that was materially adverse to the intrinsic value of GE O&G excluding, among other items, changes in the amount of goodwill. The merger agreement further provided that the audited financial statements would be attached to the merger agreement.

In March 2017, General Electric delivered to Baker Hughes audited financial statements for GE O&G, which reflected approximately $4 billion of goodwill impairments in 2014 and 2015 that were not reflected in the unaudited financial

1

statements for GE O&G. On May 30, 2017, Baker Hughes issued a proxy statement to its stockholders seeking their approval of the merger. The proxy statement represented that, after receiving and reviewing the audited financial statements for GE O&G, Baker Hughes confirmed to General Electric that any differences between the audited and unaudited financial statements were not material and, therefore, the termination right in the merger agreement was not available.

Over two years after the merger closed, two Baker Hughes stockholders separately filed class action lawsuits asserting claims for breach of fiduciary duty against the members of the Baker Hughes board and for aiding and abetting and fraud against General Electric. After defendants moved to dismiss the first case, the two actions were consolidated and plaintiffs abandoned their claims against the Baker Hughes directors and their fraud claim against General Electric. The consolidated complaint contains four claims: two claims for breach of fiduciary duty against the CEO and CFO of Baker Hughes and two claims against General Electric for aiding and abetting breaches of fiduciary duty by the Baker Hughes board. Defendants moved to dismiss the consolidated complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

Plaintiffs' primary contention is that General Electric aided and abetted the Baker Hughes directors in breaching their duty of care by creating an informational vacuum that induced the board to enter a bad deal based on GE O&G's unaudited

2

financial statements. This claim is not reasonably conceivable. Plaintiffs' allegations do not show that General Electric tainted the sale process the Baker Hughes board oversaw. Rather, they show that General Electric negotiated at arm's length with a thirteen-member board consisting of twelve concededly independent and disinterested non-employee directors and the company's CEO. The plain terms of the merger agreement the board approved reflect, furthermore, that the board acted within the range of reasonableness by securing protective provisions to address differences between the unaudited and audited financial statements of GE O&G materially adverse to its intrinsic value.

For these reasons and others discussed in detail below, the court concludes that all of the claims in the consolidated complaint fail to state a claim for relief and must be dismissed except for plaintiffs' claim against the CEO concerning the failure to disclose the unaudited financial statements in the proxy statement.

## I. BACKGROUND

The facts recited in this opinion come from the Consolidated Verified Class Action Complaint (the "Complaint") and documents incorporated therein.[1] Any additional facts are subject to judicial notice.

---

[1] Consolidated Verified Class Action Compl. ("Compl.") (Dkt. 22). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

## A.    The Players

Non-party Baker Hughes, Inc. ("Baker Hughes" or the "Company") was a publicly traded Delaware corporation headquartered in Houston, Texas that provided oil field services.[2]  On July 3, 2017, Baker Hughes merged with GE O&G, creating "Baker Hughes, a General Electric Company" ("BHGE").[3]  This transaction is referred to hereafter as the "Merger."

Plaintiffs Tri-State Joint Fund and City of Providence (together, "Plaintiffs") held Baker Hughes stock continuously from October 2016 and August 2016, respectively, until the Merger closed.[4]

Defendant Martin S. Craighead was the Chairman, CEO, and President of Baker Hughes from July 2010 until July 2017.[5]  Defendant Kimberly Ross was the CFO of Baker Hughes from October 2014 to May 2017.[6]  At the times relevant to this action, the Baker Hughes board of directors (the "Board") consisted of thirteen members:  Craighead, Gregory D. Brenneman, Clarence P. Cazalot, Jr., William H. Easter III, Lynn L. Elsenhans, Anthony G. Fernandes, Claire W. Gargalli, Pierre Jean-Marie Henri Jungels, James A. Lash, J. Larry Nichols, James W. Stewart,

---

[2] Compl. ¶ 19.

[3] *Id.* ¶¶ 19, 165.

[4] *Id.* ¶¶ 17-18.

[5] *Id.* ¶ 23.

[6] *Id.* ¶ 24.

Charles J. Watson, and Larry D. Brady.[7]  Twelve of these directors—all except Craighead—were non-employees of Baker Hughes.  The Complaint does not name any of these twelve outside directors as defendants.

Defendant General Electric Company ("GE") is a publicly traded New York corporation with its principal place of business in Boston, Massachusetts.[8]  GE is a multi-industry conglomerate, with major segments in power, aviation, and healthcare.[9]

### B.    Baker Hughes' Proposed Merger with Halliburton

In November 2014, Baker Hughes and Halliburton Company, a large oil field services provider, entered into a plan of merger.[10]  The proposed merger with Halliburton faced significant regulatory scrutiny, causing Baker Hughes to consider potential asset divestitures.[11]  As part of this process, Baker Hughes sent confidential due diligence materials to GE concerning certain of its businesses.[12]

---

[7] Both Plaintiffs named eleven of the twelve outside directors as defendants in their initial complaints, but they were dropped as defendants when Plaintiffs filed the Complaint.  *See* Tri-State Joint Fund Compl. ¶¶ 25-35 (C.A. No. 2019-0638-AGB, Dkt. 1); City of Providence Compl. ¶¶ 25-35 (C.A. No. 2019-0857-AGB, Dkt. 1).  Baker Hughes director Larry D. Brady was omitted from the initial pleadings.  *See* Jackson Aff. Ex. A ("Proxy") at 119 (Dkt. 29).

[8] Compl. ¶ 20.

[9] *Id.* ¶ 21.

[10] *Id.* ¶ 25.

[11] *Id.* ¶¶ 25-26.

[12] *Id.*

On April 6, 2016, the Department of Justice filed a lawsuit to block Baker Hughes' proposed merger with Halliburton, citing antitrust concerns.[13] On April 30, 2016, the proposed merger was terminated.[14] Baker Hughes received a $3.5 billion termination fee from Halliburton in connection with the failed transaction, but incurred significant costs and operating losses during the more than sixteen months that the proposed merger with Halliburton was pending.[15]

## C.    GE and Baker Hughes Negotiate and Agree on a Merger

In August 2016, Lorenzo Simonelli, the CEO of GE O&G, asked Craighead to meet to discuss "a broader potential strategic relationship between their respective companies."[16] On September 15, 2016, Simonelli introduced Craighead to GE CEO Jeffrey Immelt to discuss a possible strategic combination.[17] The following day, the Baker Hughes Board held a meeting to discuss a potential merger with GE.[18]

In late September 2016, GE provided Baker Hughes representatives with GE O&G financial data, including (i) unaudited financial statements for GE O&G for the years ended December 31, 2014, December 31, 2015, and the first three quarters

---

[13] *Id.* ¶ 27.

[14] *Id.* ¶ 28.

[15] *Id.* ¶¶ 28-29.

[16] *Id.* ¶ 33 (quoting Proxy at 75).

[17] *Id.* ¶ 35.

[18] *Id.* ¶ 37.

of 2016 (the "Unaudited Financials"); and (ii) non-public GE O&G management projections for fiscal years 2016 through 2020 (the "GE O&G Forecasts").[19] At this time, the financial results for the GE O&G business segment were included in GE's financial statements and separate audited financial statements for GE O&G were not available.[20]

On October 7, 2016, Immelt proposed a combination of GE O&G with Baker Hughes that would result in GE owning 65% of the combined company and Baker Hughes stockholders owning 35% and receiving a $6 billion cash dividend.[21] On October 13, Immelt presented a revised offer, where GE would own 62.5% of the combined company and Baker Hughes stockholders would own 37.5% and receive a $7.4 billion cash dividend.[22]

On October 14, 2016, the Baker Hughes Board met to discuss GE's revised offer.[23] At that meeting, Baker Hughes' financial advisor, Goldman Sachs & Co. LLC ("Goldman") reviewed with the Board GE O&G's high level financials.[24] In its presentation, Goldman's analyses relied on the Unaudited Financials and the GE

---

[19] *Id.* ¶ 38-39.

[20] *Id.* ¶ 22.

[21] *Id.* ¶ 41.

[22] *Id.* ¶ 47.

[23] *Id.* ¶ 50.

[24] *Id.* ¶¶ 40, 50.

O&G Forecasts, including a discounted cash flow analysis based on the GE O&G Forecasts.[25]

On October 21, 2016, GE announced its overall third quarter results for 2016, which reflected a "worse-than-expected" quarter.[26] Some analysts identified GE O&G as the "primary driver" of GE's negative results.[27]

On October 26, 2016, Goldman reviewed with the Baker Hughes Board the "Q3 2016 highlights" for GE and Baker Hughes.[28] On October 27 and October 28, representatives of Baker Hughes and GE negotiated the terms of a proposed transaction.[29] On October 29, 2016, during a Baker Hughes Board meeting, Craighead informed the Board that GE had committed to have audited financial statements for GE O&G completed by April 30, 2017.[30]

On October 30, 2016, the Baker Hughes Board met to consider a proposed transaction based on the terms of General Electric's revised offer.[31] At the meeting, Goldman explained its financial analysis of the proposed transaction and rendered a fairness opinion, which was based in part on the Unaudited Financials and GE O&G

---

[25] *Id.* ¶ 50.

[26] *Id.* ¶ 58.

[27] *Id.*

[28] *Id.* ¶ 61.

[29] *Id.* ¶¶ 62, 66.

[30] *Id.* ¶¶ 69, 71.

[31] *Id.* ¶ 72.

Forecasts.[32]     The Baker Hughes Board thereafter unanimously approved the proposed merger and, later in the day on October 30, Baker Hughes and GE entered into a Transaction Agreement and Plan of Merger (the "Merger Agreement").[33]

The Merger Agreement contained a closing condition obligating GE to deliver to Baker Hughes audited financial statements for GE O&G for the years ended December 31, 2014, December 31, 2015, and December 31, 2016 (the "Audited Financials") "[a]s promptly as reasonably practicable following December 31, 2016 (and in any event no later than April 15, 2017)."[34]     The Merger Agreement also provided Baker Hughes the right to terminate the Merger Agreement if the Audited Financials differed from the Unaudited Financials in a manner that was materially adverse "to the intrinsic value . . . of GE O&G" but "excluding any differences resulting from," among other things, "any changes in the amount of goodwill or intangible assets."[35]     The Merger Agreement further provided that the Unaudited Financials would be attached to the Merger Agreement.[36]

---

[32] *Id.* ¶¶ 3, 73.

[33] *Id.* ¶¶ 4, 77, 78; *see* Jackson Aff. Ex. C ("Merger Agreement").

[34] Merger Agreement § 7.05(a).

[35] *Id.* § 8.03(e)(ii).

[36] *Id.* § 5.04(c).

### D. GE O&G Provides Baker Hughes with Its Audited Financials

On March 16, 2017, KPMG finished auditing GE O&G's financial statements for the years ended December 31, 2014 through 2016.[37] Later in March, GE delivered the Audited Financials to Baker Hughes.[38] The Audited Financials differed from the Unaudited Financials in a number of ways, including the following variances (all figures in millions):[39]

|  | EBIT | Goodwill |
|---|---|---|
| 2015 Audited | $9 | $6,867 |
| 2015 Unaudited | $2,420 | $10,600 |
| Difference | ($2,411) | ($3,733) |

|  | EBIT | Goodwill |
|---|---|---|
| 2016 Audited | $732 | $6,680 |
| 2016 Unaudited (Projected) | $1,595 | $10,600 |
| Difference | ($863) | ($3,920) |

The Audited Financials reflected a $2.1 billion goodwill impairment in GE O&G's Surface, Subsea & Drilling ("SS&D") sub-segment in 2015 that was not disclosed in the Unaudited Financials, even though the impairment test was completed in the third quarter of 2015.[40] Specifically, Baker Hughes' definitive

---

[37] Compl. ¶ 86.

[38] *Id.* ¶ 87.

[39] *Id.* ¶¶ 94, 134, 136.

[40] Proxy at FS-47; *see also* Compl. ¶ 110 ("GE tests goodwill for impairment annually in the third quarter of each year using data as of July 1 of that year.").

proxy statement (the "Proxy") explained that "[a]s a consequence of the continued pressure on oil prices, the revised expected cash flows for [SS&D] resulted in a goodwill impairment charge of $2,080 million."[41] This goodwill impairment, combined with certain other impairments, currency translations, and dispositions, resulted in the Unaudited Financials overstating goodwill by approximately $4 billion.[42] This decision refers to these decreases in goodwill collectively as the "Goodwill Impairments." Goldman did not revise its fairness opinion to address the differences between the Unaudited and Audited Financials.[43]

### E. Baker Hughes Issues a Proxy and the Merger Closes

On May 30, 2017, Baker Hughes disseminated the Proxy to its stockholders seeking their approval of the proposed Merger.[44] The Proxy contained the Audited Financials, which reflected the Goodwill Impairments, but did not disclose the Unaudited Financials.[45] The Proxy represented that following "receipt and review" of the Audited Financials, Baker Hughes confirmed to GE that any differences

---

[41] Proxy at FS-47.

[42] Compl. ¶ 116. The other decreases in goodwill include $1.4 billion in accumulated impairments in SS&D in 2014, $254 million in accumulated goodwill impairments in GE O&G's Digital Services segment, and approximately $500 million for dispositions and currency translation. *Id.*; Proxy at FS-47.

[43] Compl. ¶¶ 10, 147.

[44] *Id.* ¶ 151.

[45] *Id.* ¶ 152.

11

between the Unaudited and Audited Financials "are not material" and, therefore, that Baker Hughes' termination right in the Merger Agreement "is not available."[46]

On June 30, 2017, the Baker Hughes stockholders approved the Merger, which closed on July 3, 2017.[47] After the closing, GE held approximately 62.5% of the shares of the new combined entity—BHGE.[48] Baker Hughes terminated Ross without cause in May 2017 and Craighead joined the board of BHGE as Vice Chairman after the closing.[49] Neither is alleged to have become an officer of BHGE.

## II. PROCEDURAL HISTORY

On August 13, 2019, Tri-State Joint Fund filed its initial complaint in this action, asserting five claims.[50] The first two claims asserted that the Baker Hughes Board and Craighead and Ross (as officers of the Company) breached their fiduciary duties in various respects in connection with their approval of the Merger and by failing to make full and fair disclosure to the Company's stockholders when seeking their approval of the Merger.[51] The next two claims asserted that GE aided and

---

[46] *Id.* ¶ 155; *see, e.g.*, Proxy at 28.

[47] Compl. ¶¶ 164-65.

[48] *See id.* ¶ 47; Proxy at 29, 47.

[49] Compl. ¶¶ 23-24.

[50] Dkt. 1.

[51] *Id.* ¶¶ 157, 163-64. As noted above, Baker Hughes director Larry D. Brady was not named as a defendant in this pleading.

12

abetted the Board's breaches of fiduciary duties in both respects.[52] The fifth claim asserted a claim for common law fraud against GE.[53]

On October 28, 2019, the City of Providence filed a separate action asserting the same five claims set forth in Tri-State Joint Fund's initial complaint.[54] That action was consolidated with the Tri-State Joint Fund action on November 18, 2019.[55]

On December 17, 2019, Plaintiffs filed a Consolidated Verified Class Action Complaint (as defined above, the "Complaint").[56] The Complaint is significantly different than both of the Plaintiffs' initial pleadings. Plaintiffs abandoned all of their claims against the outside members of the Baker Hughes Board as well as their common law fraud claim against GE.

The Complaint contains four claims. Count I asserts that Craighead and Ross breached their fiduciary duties in connection with the Merger.[57] Count II asserts that Craighead and Ross breached their "disclosure duties" in several respects.[58] Counts

---

[52] *Id.* ¶¶ 174, 180-81.

[53] *Id.* ¶¶ 184-97.

[54] C.A. No. 2019-0857-AGB (Dkt. 1).

[55] Dkt. 21.

[56] *See* Compl.

[57] *Id.* ¶¶ 187-92.

[58] *Id.* ¶¶ 193-99.

III and IV were not changed from Plaintiffs' initial pleadings. They both assert that GE aided and abetted the breaches of fiduciary duties by the Baker Hughes Board.[59]

On February 12, 2020, all of the Defendants filed motions to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[60] On July 16, 2020, the court heard oral argument on the motions.

## III. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[61]

The court will address first the Plaintiffs' lead claim, Count III. Next, the court will address Counts II and IV together, and then turn to Count I.

### A. Whether GE Aided and Abetted a Breach of Fiduciary Duty by the Baker Hughes Board

Count III asserts that GE aided and abetted breaches of fiduciary duty by the members of the Baker Hughes Board in connection with their approval of and

---

[59] *Id.* ¶¶ 200-19.

[60] Dkt. 27; Dkt. 29.

[61] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

14

support for the Merger.[62]  The elements of a claim for aiding and abetting a breach of fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[63]

The allegations underlying Count III comprise two discrete theories for a claim of aiding and abetting.  The first concerns the Board's approval of the Merger Agreement on October 30, 2016, based on the Unaudited Financials and the lack of information about the Goodwill Impairments.  The second theory concerns the Board's alleged failure—after receiving the Audited Financials in March 2017—to consider terminating the Merger or modifying its terms after becoming aware of the Goodwill Impairments.  Before turning to those theories, the court reviews the legal framework relevant to alleging a predicate breach of fiduciary duty to support a claim for aiding and abetting.

As noted above, in amending their initial pleadings, Plaintiffs abandoned their claims for breach of fiduciary duty against the non-employee members of the Baker Hughes Board who approved the Merger, each of whom is exculpated from personal liability for breaches of the duty of care under the Company's certificate of

---

[62] *See* Compl. ¶¶ 200-10.

[63] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citations, internal quotation marks, and alterations in original omitted).

incorporation.[64]  In doing so, Plaintiffs tacitly concede the independence and disinterestedness of twelve of the thirteen members of the Board and that they cannot allege a non-exculpated claim against the members of the Board.  Indeed, except with respect to Craighead, whom the Complaint names as a defendant only in his capacity as an officer,[65] Plaintiffs do not argue that any member of the Board suffered from a disabling conflict of interest, was not independent, or acted in bad faith in deciding to approve the Merger.  Instead, the premise of Plaintiffs' aiding and abetting claim in Count III is that the Baker Hughes directors breached their duty of care by acting unreasonably in fulfilling their duty under *Revlon*[66] and its progeny "to get the highest value reasonably attainable for the shareholders" in a sale of control transaction.[67]

The parties agree that enhanced scrutiny under *Revlon* presumptively would apply to the Board's approval of the Merger because the Merger shifted control of Baker Hughes from a diffuse group of public stockholders to GE, which owned

---

[64] Jackson Aff. Ex. K (Restated Certificate of Incorporation of Baker Hughes Incorporated), Article TENTH.

[65] *See* Pls.' Answering Br. 1, 57 n.166, 64 (Dkt. 32).

[66] *Revlon, Inc. v. McAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[67] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1288 (Del. 1989) (citing *Revlon*, 506 A.2d at 182);  *see also Kahn v. Stern*, 2018 WL 1341719, at *1 n.3 (Del. Mar. 15, 2018) (Strine, C.J.) (ORDER) ("The presence of an exculpatory charter provision does not mean that *Revlon* duties no longer apply.  Rather, *Revlon* remains applicable as a context-specific articulation of the directors' duties but directors may only be held liable for a non-exculpated breach of their *Revlon* duties.").

16

approximately 62.5% of the combined company after the Merger.[68]  Based on the approval of the Merger by Baker Hughes' stockholders, Craighead and Ross argue that the business judgment rule—not enhanced scrutiny—should apply under *Corwin v. KKR Financial Holdings LLC*.[69]  This argument fails because, as discussed in Part III.B.1, the vote of Baker Hughes' stockholders in favor of the Merger was not fully informed.  Enhanced scrutiny thus applies to the Board's decision to approve the Merger for purposes of determining if a predicate breach has been alleged sufficiently.

"The key features of an enhanced scrutiny test are:  (a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing."[70]  "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned

---

[68] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 48 (Del. 1994) (the obligation under *Revlon* "to seek the best value reasonably available to the stockholders" arises where the effect of a transaction "is to shift control . . . from the public stockholders to a controlling stockholder").

[69] 125 A.3d 304, 306 (Del. 2015) (Strine, C.J.) (holding that a transaction that otherwise would be subject to enhanced scrutiny is afforded the protection of the business judgment rule where it "has been approved by a fully informed, uncoerced majority of the disinterested stockholders").

[70] *Paramount*, 637 A.2d at 45.

approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions."[71]

Enhanced scrutiny "is not a license for law-trained judges to second-guess reasonable, but debatable, tactical choices that directors have made in good faith."[72] Rather, as our Supreme Court has explained, the focus is on whether "the directors' decision was, on balance, within a range of reasonableness:"

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.[73]

With these principles in mind, the court turns to consider the two theories underlying the aiding and abetting claim asserted in Count III.

### 1. The Directors' Approval of the Merger Agreement

Plaintiffs first argue that the Baker Hughes Board failed to act reasonably when it "blindly approved a sale based on false Unaudited Financials, despite clear

---

[71] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) (Strine, V.C.).

[72] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005).

[73] *Paramount*, 637 A.2d at 45 (emphasis omitted).

red flags."[74]  Apart from the fact that the Board did not have the Audited Financials for GE O&G when it approved the Merger Agreement, the only "red flag" Plaintiffs identify is "GE's terrible Q3 2016 results – announced before signing and attributed to GE O&G – and the significant degree to which GE O&G lagged behind the full-year projected 2016 EBIT."[75]

Plaintiffs assert that GE knowingly participated in the Board's failure to act reasonably in approving the Merger Agreement by "creat[ing] an informational vacuum to induce the Board into a bad deal."[76]  The gravamen of this theory is that "GE knew by the end of 2015 – months before the negotiations – that it needed to incur greater than $4 billion in impairments at GE O&G" but concealed this information from Baker Hughes by not including the Goodwill Impairments in the Unaudited Financials.[77]  According to Plaintiffs, "GE instead provided the GE O&G Forecasts, which are inconsistent with the book value writedown it was required to take."[78]

In my opinion, Plaintiffs' allegations do not support a reasonably conceivable claim that the members of the Baker Hughes Board breached their fiduciary duties

---

[74] Pls.' Answering Br. 31.

[75] *Id.* at 32.

[76] *Id.* at 38.

[77] *Id.* at 39.

[78] *Id.* at 40.

19

by failing to act within the range of reasonableness in deciding to approve the Merger Agreement. As such, the first theory underlying the aiding and abetting claim asserted in Count III fails to state a claim for relief based on the lack of a predicate breach of fiduciary duty. Three reasons support this conclusion.

First, Plaintiffs do not contend—nor could they—that the Board's decision to enter into the Merger Agreement based on the Unaudited Financials was unreasonable *per se*. "Under Revlon, 'directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there.'"[79] As the Complaint acknowledges, "GE O&G was a segment of GE that was not publicly traded" and its "financial results were reported as part of GE's consolidated financials" when GE approached Baker Hughes to explore a strategic relationship in August 2016 and during the course of their negotiations in September and October of 2016.[80] As a practical matter, therefore, it was necessary for the Baker Hughes Board to utilize the Unaudited Financials to negotiate a transaction if it wished to pursue a strategic combination with GE O&G.

Second, the plain terms of the Merger Agreement belie Plaintiffs' conclusory allegation that the Baker Hughes Board "blindly" relied on the Unaudited Financials.

---

[79] *Chester Cty. Emps.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *16 (Del. Ch. June 21, 2019) (quoting *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011)).

[80] Compl. ¶¶ 22, 88.

To the contrary, Baker Hughes secured provisions in the Merger Agreement to protect against the risk, which Baker Hughes specifically disclosed in a section of the Proxy titled "Risks and Potentially Negative Factors," "that audited financial statements for GE O&G were not available at the time of signing the [Merger] Agreement."[81] Specifically, the Merger Agreement contains (i) a representation and warranty concerning the preparation of the Unaudited Financials, (ii) a condition to ensure that Baker Hughes would receive the Audited Financials before closing, and (iii) a termination right coupled with a fee reimbursement provision to address any adverse differences between the Audited and Unaudited Financials "material to the intrinsic value" of GE O&G::

- GE represented and warranted that the Unaudited Financials "have been prepared in conformity with GAAP . . . and fairly present in all material respects the combined financial position and the combined results of operations of GE O&G as of the dates or for the periods presented therein."[82]

- Baker Hughes' obligation to close the Merger was conditioned on GE delivering the Audited Financials to Baker Hughes "[a]s promptly as reasonably practicable following December 31, 2016 (and in any event no later than April 15, 2017)."[83]

- Baker Hughes had the right to terminate the Merger Agreement if the Audited Financials differed from the Unaudited Financials "in a manner that is material to the intrinsic value (determined in a manner consistent with appropriate valuation methodologies) of GE O&G

---

[81] Proxy at 87.

[82] Merger Agreement § 5.04(c).

[83] *Id.* § 7.05(a).

21

in a manner that is adverse (excluding any differences resulting from (x) any changes in the amount of goodwill or intangible assets and (y) the matters described on Annex 8.03(e)).”[84]

- Baker Hughes' right to terminate the Merger Agreement for failure to deliver “Comparable GE O&G Audited Financial Statements” was coupled with a requirement that “GE shall pay to [Baker Hughes] all of the Expenses of [Baker Hughes] up to an aggregate amount of $40 million” if Baker Hughes exercised its termination right.[85]

In short, the provisions of the Merger Agreement and the Proxy quoted above demonstrate that the Baker Hughes Board knew there were risks to using the Unaudited Financials to negotiate a combination with GE O&G and made a business judgment to address those risks in a nuanced way in the Merger Agreement.[86] In my view, the existence of these protective provisions demonstrates that the Board— which included twelve concededly independent and disinterested members who were advised by sophisticated legal (Davis Polk) and financial (Goldman)

---

[84] *Id.* §§ 8.03(e)(ii), 9.03(c).

[85] *Id.* § 9.05(a).

[86] Plaintiffs characterize the goodwill exclusion in Section 8.03(e)(ii) of the Merger Agreement as a “loophole” that “GE requested” and argue that it should have put the Board “on notice . . . that GE O&G's financials required scrutiny.” Pls.' Answering Br. 5. The Complaint is devoid of any nonconclusory factual allegations to support the assertion that GE sought the goodwill exclusion. In any event, it is logical that the provision contained an exclusion for goodwill given that its purpose was to identify material differences “to the intrinsic value” of GE O&G because, as Plaintiffs concede, goodwill is a noncash item that would not factor into GE O&G's free cash flows in a discounted cash flow analysis. *See* Mot. to Dismiss Hr'g Tr. at 73 (July 16, 2020) (Dkt. 54).

22

advisors—acted within the range of reasonableness in approving the Merger Agreement based on the Unaudited Financials.

Plaintiffs suggest the Baker Hughes Board should "have insisted on modified terms" after learning about GE results for the third quarter of 2016,[87] which showed that GE O&G was "expected to decline 15-20% in 2016."[88] The Complaint, however, alleges that the terms of the proposed transaction were negotiated on October 27, 2016 and October 28, 2016, *after* Goldman already had reviewed "GE and the Company's Q3 2016 highlights" with the Board on October 26, 2016.[89] In any event, the Board indisputably was aware of the 2016 third quarter results for GE O&G before it approved the Merger Agreement, which, as discussed above, contained a structure that fell within the range of reasonableness for addressing adverse differences between the Audited and Unaudited Financials that were "material to the intrinsic value" of GE O&G.

Third, none of the "informational vacuum" cases on which Plaintiffs rely supports finding that the Board's decision to approve the Merger Agreement fell outside the range of reasonableness as a predicate for an aiding and abetting claim. As this court has observed, "[w]hat typically drives a finding of unreasonableness is

---

[87] Pls.' Answering Br. 32.

[88] Compl. ¶ 58(b).

[89] Compl. ¶¶ 61-62.

evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process."[90] Each of the authorities upon which Plaintiffs rely—*Rural Metro*,[91] *PLX*,[92] *KCG*,[93] and *TIBCO*[94]—bear out this observation.

In *Rural Metro*, for example, the Court of Chancery found after trial that certain actions fell outside the range of reasonableness where the target board's financial advisor, tainted with self-interest to obtain fees from various sources during the sale process, withheld from the target board material information about its conflicts of interest and valuation methodology.[95] With respect to one of the board's actions, the court noted that, "[a]bsent conflicts of interest, this decision would be one of the many debatable choices that fiduciaries and their advisors must make when exploring strategic alternatives in an uncertain world, and it would fall within the range of reasonableness."[96]

---

[90] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 831 (Del. Ch. 2011) (citing *Dollar Thrifty*, 2010 WL 3503471 at *18-19; *Toys "R" Us*, 877 A.2d at 1000-01).

[91] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

[92] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019).

[93] *KCG Hldgs.*, 2019 WL 2564093.

[94] *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894 (Del. Ch. Oct. 20, 2015).

[95] 88 A.3d at 91-96.

[96] *Id.* at 91.

24

In *PLX*, the Court of Chancery similarly found after trial that a target board's decisions fell outside the range of reasonableness where an activist investor and a director on the target board affiliated with the activist had tainted the sale process.[97] In particular, the activist and the director, as well as the target board's financial advisor, all of whom were motivated financially to engineer the transaction, failed to tell the board about the acquirer's initial plan to bid for the company, which "fatally undermined the sale process."[98] As in *Rural Metro*, the *PLX* court found that "[a]bsent [these] divergent interests, the Board's sale process in this case would fall within a range of reasonableness."[99]

More recently, in *KCG Holdings*, the court sustained aiding and abetting claims against an acquirer (Virtu) and the target board's largest stockholder and longtime financial advisor (Jefferies) whose actions created an "informational vacuum."[100] As to Jefferies, the court found sufficient to survive a motion to dismiss allegations that Jefferies (i) "negotiated with Virtu for months and committed to a $20 per share price before notifying [the target board] of Virtu's interest," (ii) shared

---

[97] 2018 WL 5018535, at *1-2, *47.

[98] *Id.* at *47.

[99] *Id.* at *44.

[100] 2019 WL 2564093, at *19.

the target's confidential information with Virtu, and (iii) did not come clean with the board about its communications with Virtu.[101]

Finally, although the issue in *TIBCO* involved only one aspect of a sale process, *i.e.*, a share count error that came to light after the company had entered into a merger agreement, it also is instructive.[102] There, this court sustained an aiding and abetting claim after finding it was reasonably conceivable that a target board's financial advisor was financially "motivated to and intentionally created an informational vacuum by failing to disclose material information to the Board" about the share count error when the board was considering its options to address the error.[103]

Significantly, each of these "informational vacuum" cases share a common theme. They each involved a player—privy to the internal deliberations or process of a target board that had conflicting financial interests—who deliberately withheld material information from the board, thus casting doubt on the integrity of a sale process. That is not this case. To be sure, GE was motivated to strike the best deal

---

[101] *Id.* (internal quotations marks omitted). The court sustained the claim against Virtu because it "worked with Jefferies to pressure the Board to approve the Merger for a less-than-value-maximizing price, accepted confidential information concerning BondPoint to develop its acquisition strategy, and exploited [the target CEO]'s conflict to obtain his support of the merger price." *Id.* (internal citations and quotation marks omitted).

[102] 2015 WL 6155894, at *1.

[103] *Id.* at *26.

it could in combining its O&G segment with Baker Hughes, but the Complaint does not allege facts suggesting that GE was privy to the internal process of the Baker Hughes Board or conspired with anyone who was. Thus, GE was not in a position to taint the Board's internal deliberations. Nor does the Complaint allege that GE was in a position of trust vis-à-vis Baker Hughes. To the contrary, by all accounts, the Merger Agreement was the product of arm's length negotiations with GE on one side of the negotiating table and Baker Hughes on the other.

For the reasons discussed above, Plaintiffs' first theory underlying its aiding and abetting claim in Count III fails to state a claim for relief because Plaintiffs' allegations do not support a reasonably conceivable claim of a predicate breach of fiduciary duty by the Baker Hughes Board.

### 2. The Directors' Alleged Failure to Take Action after Baker Hughes Received the Audited Financials

Plaintiffs' second theory in Count III focuses on alleged failures of the Board to take action after the Company received the Audited Financials for GE O&G in March 2017. According to Plaintiffs, given the lack of any reference in the minutes "to a review of the Audited Financials," it is fair to infer that "the Board failed to consider or analyze the Audited Financials at all before choosing to continue with the Merger."[104] Plaintiffs further theorize that once the Company received the

---

[104] Pls.' Answering Br. 32.

Audited Financials, the Board failed to "(i) review the impairment tests or underlying financial analysis," "(ii) get an updated fairness opinion or any valuation analysis," "(iii) investigate the adequacy of GE O&G's accounting or internal control," "(iv) seek to renegotiate the economic terms of the deal," or (v) "seriously investigate the Termination Right" in the Merger Agreement.[105]

Defendants counter that the Baker Hughes Board, in fact, did examine the differences between the Unaudited and Audited Financials and reasonably determined that there was no basis to terminate the Merger Agreement.[106] For support, Defendants rely on the following statement in the Proxy:

> Following its receipt and review of the [Audited Financials], Baker Hughes has confirmed to GE that any difference between the [Audited Financials] and the applicable [Unaudited Financials] are not material and therefore such termination right is not available to Baker Hughes.[107]

Defendants further contend that Plaintiffs fail "to plead why the 2015 goodwill impairment should have caused anyone at Baker Hughes to consider abandoning the Merger—which is not surprising given the express exclusion of goodwill adjustments in Section 8.03(e) of the Merger Agreement."[108]

---

[105] *Id.* at 32-33.

[106] Baker Hughes Defs.' Opening Br. 21 (Dkt. 29).

[107] Proxy at 28; Compl. ¶ 155 (quoting same).

[108] Baker Hughes Defs.' Opening Br. 22.

The factual basis for Plaintiffs' position is fair game for skepticism. The fact that the Board's minutes do not reference the Audited Financials is a slender reed upon which to infer that the Board and its advisers *did nothing* to review and consider the potential implications of the Audited Financials—a contention that intuitively seems inconceivable and that the Proxy directly contradicts. The court, however, may not "weigh evidence on a motion to dismiss."[109] Importantly, even if one assumes, *arguendo*, that Plaintiffs sufficiently have alleged a predicate breach for an aiding and abetting claim, the claim fails for lack of any evidence of knowing participation by GE.

"Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[110] This standard requires well-pled facts that the aider and abettor acted with "scienter," or "knowingly, intentionally or with reckless indifference."[111] As our Supreme Court has explained:

> Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board. Similarly, a bidder may be liable to a target's stockholders for aiding

---

[109] *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).

[110] *Malpiede*, 780 A.2d at 1097.

[111] *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018).

and abetting a fiduciary breach by the target's board where the bidder and the board conspire in or agree to the fiduciary breach.[112]

Critically here, whatever "informational vacuum" Plaintiffs contend was created by GE before Baker Hughes entered into the Merger Agreement was filled by the production of the Audited Financials. The Complaint acknowledges as much. It pleads that, "[o]n their face, the Comparable GE O&G Audited Financial Statements showed obvious negative material discrepancies with the Unaudited Financial Statements on which the [Merger] was predicated," including the Goodwill Impairments.[113]

Plaintiffs cite no case to support a claim for aiding and abetting liability where the alleged breach of fiduciary duty occurred *after* the alleged informational vacuum ceased to exist. More to the point, the Complaint is devoid of any allegations suggesting that GE participated—knowingly or otherwise—in any of the alleged failures of the Baker Hughes Board to take action after GE provided the Audited Financials to Baker Hughes. Absent from the Complaint, for example, are any allegations that GE took any action to prevent the Baker Hughes Board from taking any action or seeking more information from its advisors or from GE after it received the Audited Financials. Accordingly, Plaintiffs' second theory underlying its aiding

---

[112] *Malpiede*, 780 A.2d at 1097-98.

[113] Compl. ¶¶ 89, 95; *see also id.* ¶¶ 90-94.

and abetting claim in Count III fails to state a claim for relief because Plaintiffs' allegations do not sufficiently allege that GE knowingly participated in any breach of fiduciary duty by the Baker Hughes Board.[114]

* * * * *

For the foregoing reasons, the court grants GE's motion to dismiss Count III of the Complaint.

### B.    Plaintiffs' Disclosure Claims

Count II of the Complaint asserts that Craighead and Ross "breached their disclosure duties" in various respects.[115]  Count IV asserts that "GE knowingly aided and abetted the Board's breach of their duties of disclosure."[116]

Two issues arise from these claims.  The first is a *Corwin* issue, *i.e.*, whether approval of the Merger by Baker Hughes' stockholders was fully informed so that the business judgment rule—rather than enhanced scrutiny—would apply to the Board's decision to approve the Merger.  The second issue, which only becomes relevant if the Proxy was materially deficient, is whether the Complaint states a reasonably conceivable claim that Craighead and Ross (Count II) and/or GE (Count

---

[114] GE's alleged involvement in disclosures made to Baker Hughes' stockholders is addressed in Part III.B.2.

[115] Compl. ¶ 195.

[116] Compl. ¶ 216.

31

IV) may be liable for compensatory damages for such an omission or misstatement. The court considers those issues in that order.

### 1. Was Stockholder Approval of the Merger Fully Informed?

"Under Delaware law, when directors solicit stockholder action, they must disclose fully and fairly all material information within the board's control."[117] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[118] Stated differently, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[119]

"[A] plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[120] Plaintiffs' brief identifies essentially three disclosure deficiencies in the Proxy. The court addresses these next.

---

[117] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017) (internal quotation marks omitted).

[118] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[119] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449).

[120] *Solera*, 2017 WL 57839, at *8; *see also Morrison v. Berry*, 191 A.3d 268, 282 n.60 (Del. 2018) (agreeing with this statement of the law in *Solera*).

### a. Failure to Disclose the Unaudited Financials

Plaintiffs argue the Proxy was defective because it "omitted the actual Unaudited Financials that GE had used to secure Baker Hughes's agreement to the Merger."[121] According to Plaintiffs, "the divergences between the Unaudited and Audited Financials" were material.[122]

Craighead and Ross counter with essentially two responses: (i) that disclosure of the Unaudited Financials "was rendered obsolete by the publication of the Audited Financial Statements" and (ii) that their disclosure was unnecessary because "the specific unaudited historical metrics for GE Oil & Gas that Plaintiffs highlight were either disclosed in the Proxy Statement or published annually in GE's SEC filings."[123]

In my opinion, the Unaudited Financials did not become "obsolete" when the Audited Financials were published. To the contrary, the Unaudited Financials would have been material to Baker Hughes' stockholders to evaluate the fairness of the Merger because they contained the only information concerning GE O&G's historical financial performance that was available when the Baker Hughes Board approved the Merger Agreement;[124] Goldman reviewed them in connection with

---

[121] Pls.' Answering Br. 49 (emphasis omitted).

[122] *Id.* at 53 (emphasis omitted).

[123] Baker Hughes Defs.' Opening Br. 47; Baker Hughes Defs.' Reply Br. 30 (Dkt. 40).

[124] *See* Proxy at 87.

rendering its fairness opinion to the Board;[125] and they would allow stockholders to observe the differences between the Unaudited and Audited Financials to assess what the Board found to be immaterial when determining that the termination right in the Merger Agreement was not available. Separately, the materiality of the Unaudited Financials reasonably can be inferred from the fact that the Merger Agreement expressly provided that they would be attached to the Merger Agreement, ostensibly so that the Unaudited Financials would be included in the Proxy.[126]

It is not disputed that certain unaudited metrics for GE O&G were disclosed in three out of scores of filings GE and Baker Hughes made with the SEC over several months after they entered into the Merger Agreement.[127] This is inadequate. "Disclosures are not supposed to take the form of a scavenger hunt"[128] and "our law

---

[125] *Id.* at 98.

[126] Merger Agreement § 5.04(c) ("The GE O&G Financial Statements are attached hereto as Annex 5.04(c).").

[127] Specifically, Plaintiffs explain, without contradiction, "that: (i) the unaudited 2015 EBIT could be found on page 19 of a presentation [Baker Hughes] filed with the SEC as one of the 38 different Form 425 filings made in the two weeks after the Merger was announced; (ii) the unaudited 2015 EBIT could also be found in another Form 425 filing made on January 27, 2017, which was the 64th Form 425 filing made after announcement of the Merger; and (iii) . . . GE had disclosed the higher 2015 and 2016 goodwill and total asset values for GE O&G on pages 160 and 205 of GE's 2016 Annual Report on Form 10-K." Pls.' Answering Br. 53 (citations omitted).

[128] *Ark. Tchr. Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *24 (Del. Ch. June 28, 2019).

does not impose a duty on stockholders to rummage through a company's prior public filings to obtain information that might be material to a request for stockholder action."[129]   Rather, stockholders are entitled to receive material information bearing on the fairness of a transaction they are being asked to approve in a "clear and transparent manner."[130]   In sum, the Proxy contained a material omission because it did not include the Unaudited Financials.

### b. Failure to Disclose Reasons for the Differences Between the Unaudited and Audited Financials

Plaintiffs contend the Proxy was deficient because it failed to disclose "the reasons for [the] divergences" between the Unaudited and Audited Financials.[131] More specifically, Plaintiffs focus on the failure to disclose "GE's impairment analyses,"[132] the underlying cause of the Goodwill Impairments, and the "effect on valuation."[133]  This argument fails for essentially two reasons.

First, Plaintiffs' criticism concerning the failure to disclose GE's impairment analysis or its "effect on valuation" is illogical given the Complaint's allegations

---

[129] *Zalmanoff v. Hardy*, 2018 WL 5994762, at *5 (Del. Ch. Nov. 13, 2018).

[130] *Vento v. Curry*, 2017 WL 1076725, at *4 (Del. Ch. Mar. 22, 2017).

[131] Pls.' Answering Br. 53.

[132] *Id.* at 50.

[133] *Id.* at 53.

that Baker Hughes did not receive the impairment analysis[134] and that Goldman did not prepare a revised fairness opinion after receiving the Audited Financials.[135] Delaware law does not require fiduciaries to disclose information they do not possess.[136] As to the cause of the 2015 goodwill impairment on which Plaintiffs focus, the notes to the Audited Financials in the Proxy explain that GE attributed that impairment to "continued pressure on oil prices:"

> In performing the annual impairment test for goodwill in the third quarter of 2015 using data as of July 1 of that year, we determined that a step two test was required for a reporting unit within our SS&D reportable segment. *As a consequence of continued pressure on oil prices, the revised expected cash flows for this reporting unit resulted in a goodwill impairment charge of $2,080 million.* The impairment charge has been included as part of "Impairment of goodwill" in the Combined Statement of Earnings. As of December 31, 2016, we believe that the goodwill is recoverable for all of the report units; however, there can be no assurance that the goodwill will not be impaired in future periods.[137]

---

[134] Compl. ¶ 189 (alleging Craighead and Ross breached their fiduciary duties by "failing to request and take into account the goodwill impairment analyses that led to the recognition of the goodwill impairments").

[135] *Id.* (alleging Craighead and Ross breached their fiduciary duties by "failing to obtain a revised fairness opinion that took into account the" Audited Financials).

[136] *See Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1059 (Del. Ch. 1987) ("Shareholders are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price."); *In re JCC Hldg. Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003) ("Under Delaware law, there is no obligation on the part of a board to disclose information that simply does not exist.").

[137] Proxy at FS-47 (emphasis added).

Second, apart from focusing on GE's impairment analysis, Plaintiffs do not identify an undisclosed "fact" that would have significantly altered the "total mix" of information available to Baker Hughes' stockholders in evaluating the fairness of the Merger relating to any other differences between the Unaudited and Audited Financials.[138] Indeed, Plaintiffs do not dispute that the Proxy fairly and accurately described the valuation analyses Goldman performed for the Baker Hughes Board, the projections on which those analyses relied, and the projections GE provided before the Merger. As such, Plaintiffs' second challenge to the disclosures in the Proxy is without merit.

### c. The Termination Right Disclosure

Finally, Plaintiffs' argue that "the Proxy's disclosure that Baker Hughes had found the Termination Right satisfied created the affirmatively misleading impression that the Audited Financials approximated the Unaudited Financials."[139] To repeat, the disclosure in question states, as follows:

> Following its receipt and review of the [Audited Financials], Baker Hughes has confirmed to GE that any difference between the [Audited Financials] and the applicable [Unaudited Financials] are not material and therefore such termination right is not available to Baker Hughes.[140]

---

[138] *See Williams v. Geier*, 1987 WL 11285, at *5 (Del. Ch. May 20, 1987) ("It is settled law that defendants are required to disclose all germane facts . . . . [But] proxy materials need not disclose legal theories or plaintiff's characterizations of the facts.") (citations omitted).

[139] Pls.' Answering Br. 54.

[140] Proxy at 28; *see also* Compl. ¶ 155 (quoting same).

In my opinion, this disclosure was not misleading.

To begin, the disclosure quoted above is not a blanket statement "that the Audited Financials approximated the Unaudited Financials." Rather, the disclosure simply states that the termination right is not available because any differences between the Unaudited and Audited Financials "are not material."

To determine what would be material, one logically must look at the provision in the Merger Agreement that created the termination right. Section 8.03(e)(ii) of the Merger Agreement focuses on adverse differences between the Unaudited and Audited Financials "material to the intrinsic value of GE O&G" and expressly carves out "any changes in the amount of goodwill or intangible assets."[141] Thus, placed in context, the disclosure in question merely conveyed that the Baker Hughes Board had determined that the termination right in Section 8.03(e)(ii) was not available because there were no differences between the Unaudited and Audited Financials unrelated to the Goodwill Impairments or any other aspect of the carve-out that were materially adverse to the intrinsic value of GE O&G. It did not convey in an unqualified manner that the Unaudited Financials "approximated" the Audited Financials. Thus, Plaintiffs' third challenge to the disclosures in the Proxy is unavailing.

---

[141] Merger Agreement § 8.03(e)(ii).

38

* * * * *

In sum, Plaintiffs sufficiently have alleged that the failure to include the Unaudited Financials in the Proxy was a material omission. As a result, the vote of the Baker Hughes stockholders approving the Merger was not fully informed and *Corwin* does not apply. Thus, enhanced scrutiny and not the business judgment rule applies to the Baker Hughes Board's decision making in connection with the Merger. The court turns next to whether Plaintiffs have stated a claim to recover compensatory damages from Craighead, Ross, and/or GE with respect to Proxy's failure to include the Unaudited Financials.

### 2. Have Plaintiffs Stated a Claim for Damages Against Craighead, Ross, or GE Concerning the Proxy?

The relief sought in the Complaint for Counts II and IV is compensatory damages.[142] Craighead, Ross, and GE each contend that even if the Proxy contained a material deficiency, Plaintiffs have failed to plead facts sufficient to support a claim against them for liability with respect to such a deficiency. The court considers this issue first with respect to Craighead and Ross in their capacity as officers of Baker Hughes, and then as to GE as an alleged aider and abettor.

---

[142] *See* Compl. at 66 (Prayer for Relief ¶ D).

39

### a. Craighead and Ross

In their roles as officers of Baker Hughes, Craighead and Ross are not exculpated for breaches of the duty of care under the Company's 102(b)(7) provision.[143] Thus, Plaintiffs may recover damages from Craighead or Ross in their roles as officers for breach of either the duty of loyalty or the duty of care.[144]

To state a claim under the duty of loyalty, Plaintiffs must plead that Craighead and Ross "were interested in the transaction, lacked independence, or acted in bad faith."[145] To plead bad faith, a plaintiff must allege that a defendant "knowingly and completely failed to undertake their responsibilities."[146] Plaintiffs can reach this threshold by showing that "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[147] In other words, Plaintiffs must allege that the fiduciary "acted with scienter, meaning they had actual or constructive knowledge that their conduct was legally improper."[148]

---

[143] Jackson Aff. Ex. K, Article TENTH.

[144] *Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019).

[145] *Id.* at *13.

[146] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009).

[147] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[148] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (internal quotation marks and citation omitted).

Under Delaware law, the standard of care applicable to the fiduciary duty of care of an officer is gross negligence.[149] "Gross negligence involves more than simple carelessness. To plead gross negligence, a plaintiff must allege 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'"[150] "While the inquiry of whether the claims amount to gross negligence is necessarily fact-specific, the burden to plead gross negligence is a difficult one."[151]

As to Ross, Plaintiffs' allegations are exceedingly thin. The Complaint mentions Ross by name about ten times, primarily to argue she was interested in the Merger given her change in control compensation.[152] The only allegations regarding her role in the Merger are that she: (i) met with GE O&G President and CEO Lorenzo

---

[149] *Buckley Fam. Tr. v. McCleary*, 2020 WL 1522549, at *10 (Del. Ch. Mar. 31, 2020). As the court noted recently, "[i]t is an open issue of Delaware law as to whether *Revlon* applies to an officer's actions." *In re Mindbody, Inc.*, 2020 WL 5870084, at *32 n.287 (Del. Ch. Oct. 2, 2020). For purposes of this decision, the court assumes that a breach of an officer's duty of care should be assessed under the traditional gross negligence standard with respect to actions taken in the context of a sale of control transaction because it is the members of the board of directors—not the officers—who are responsible for the type of decisions that are the focus of enhanced scrutiny review under *Revlon* and its progeny. *See id.* (applying gross negligence even though *Revlon* applied to the underlying transaction because, quoting *Malpiede*, 780 A.2d at 1083, "*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply"); *Morrison v. Berry*, 2019 WL 7369431, at *22 (applying gross negligence standard to officer conduct, even though "*Revlon* applies to the underlying company sale process").

[150] *Morrison*, 2019 WL 7369431, at *22 (quoting *Zucker v. Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 30, 2016)).

[151] *Zucker*, 2016 WL 7011351, at *7 (internal quotation marks and alterations omitted).

[152] *See* Compl. ¶¶ 24, 69.

Simonelli on May 2, 2016 "to discuss 'collaboration' between Baker Hughes and GE O&G,"[153] (ii) "provided economic diligence to GE O&G's CFO, Brian Worrell,"[154] and (iii) "met with her GE counterparts to negotiate the terms of the proposed Transaction."[155]

Critically, the Complaint is devoid of any allegations that Ross had any role in drafting or disseminating the Proxy. Plaintiffs' case against Ross boils down to the unsubstantiated assertion that she "would have reviewed and authorized dissemination of the Proxy" because she was CFO of Baker Hughes.[156] This is insufficient to plead that Ross acted with *scienter* or was grossly negligent in connection with the failure to attach the Unaudited Financials to the Proxy. As such, Count II of the Complaint fails to state a claim for relief against Ross.

In contrast to its treatment of Ross, the Complaint contains numerous allegations concerning Craighead's involvement in the negotiation of the Merger,[157] which is unsurprising given his multiple roles as Chairman of the Board, CEO, and President at the time.[158] Most relevantly, the Complaint alleges that "Craighead

---

[153] *Id.* ¶ 31.

[154] *Id.* ¶ 36.

[155] *Id.* ¶ 62.

[156] Pls.' Answering Br. 64.

[157] *See* Compl. ¶¶ 31, 33-35, 37, 45, 47-48, 66, 72.

[158] *Id.* ¶ 23.

signed both the Proxy, as the Chairman and CEO of Baker Hughes, and the Form S-4, as a person about to become a director of New Baker Hughes."[159]

Although not overwhelming, this allegation is sufficient to support a reasonably conceivable claim that Craighead breached his duty of care with respect to the preparation of the Proxy he signed as Baker Hughes' CEO. This is so, in my view, given the importance of the Unaudited Financials—the only source of GE O&G historical financial information available to Baker Hughes before it signed the Merger Agreement—and given the categorical obligation in Section 5.04(c) of the Merger Agreement to attach the Unaudited Financials to the Merger Agreement.[160] Perhaps discovery will show that the failure to attach the Unaudited Financials to the Proxy was inadvertent or handled by advisors on which Craighead reasonably relied, but those factual questions cannot be resolved on the pleadings.[161] Count II thus survives as to Craighead.

---

[159] *Id.* ¶ 197; *see* Proxy.

[160] *See In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *11 (Del. Ch. June 18, 2018) ("Vance affixed his signature to the Proxy in his capacity as President and CEO and presented the information to the stockholders for their consideration. This means he may be liable for material misstatements in the Proxy in his capacity as an officer in addition to his capacity as a director.").

[161] Craighead contends that Plaintiffs' allegations "do not avoid the exculpation protections afforded" him because they fail to "highlight the specific actions that Mr. Craighead undertook as an officer (as distinct from actions as a director)." Baker Hughes Defs.' Reply Br. 19 (internal quotation marks and alterations omitted). This argument is fact intensive and premature. *See Morrison*, 2019 WL 7369431, at *27 ("Anicetti argues that his work with the 14D-9 was so intertwined with his role as director that he should be given the benefit of the exculpation provision. This may prove true on a more developed record, in

### b. GE

Count IV of the Complaint asserts that GE aided and abetted the Board's breach of fiduciary duty with respect "to provid[ing] full and fair disclosures to [Baker Hughes'] stockholders."[162] To repeat, "[t]o survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[163]

Even assuming for the sake of argument that the Complaint sufficiently pleads a non-exculpated breach of duty against the Board with respect to the disclosures in the Proxy, which is far from clear given the sparsity of allegations in the Complaint concerning the directors' involvement apart from Craighead, the Complaint fails to sufficiently allege knowing participation to sustain an aiding and abetting claim against GE. Again to repeat, knowing participation requires that the aider and

---

which case his actions are exonerated (absent disloyalty). At the pleading stage, however, and in light of the allegation that, in his role as CEO, Anicetti participated in preparing the 14D-9, I infer that Anicetti remains liable in that regard for gross negligence as well as disloyalty in connection with the proxy.").

[162] Compl. ¶ 212.

[163] *Malpiede*, 780 A.2d at 1096 (citations, internal quotation marks, and alterations in original omitted).

abettor "act with *scienter*," *i.e.*, "act knowingly, intentionally, or with reckless indifference; that is, with an illicit state of mind."[164]

Plaintiffs argue that "GE aided and abetted the Board's breach through its co-authorship of the BHGE Form S-4, prepared in conjunction with the Proxy, and its withholding of information that should have been disclosed therein."[165] This argument lacks merit with respect to Plaintiffs' only viable disclosure deficiency—the failure to include the Unaudited Financials in the Proxy.

As an initial matter, GE did not withhold the Unaudited Financials from Baker Hughes; rather, GE provided them to Baker Hughes in the first place.[166] The real issue is whether (i) GE knew the Baker Hughes Board was acting in breach of its duty of care by failing to ensure that the Unaudited Financials were included in the Proxy that Baker Hughes prepared for dissemination to its stockholders and (ii) GE participated in that breach. The Complaint is devoid of any well-pled facts on either score to support a reasonable inference that GE acted with the illicit state of mind necessary to sustain a claim for aiding and abetting against it.[167] Thus, Count IV fails to state a claim for relief.

---

[164] *RBC Capital Markets*, 129 A.3d at 862 (internal quotation marks and alterations omitted).

[165] Pls.' Answering Br. 49.

[166] Compl. ¶ 39.

[167] The Complaint alleges "GE had known and intended, as part of the process of preparing the audited financials and the Form S-4 with Baker Hughes, that Baker Hughes would

## C.     The Breach of Fiduciary Duty Claim Against Craighead and Ross

Count I of the Complaint is an odd claim.  As pled in the Complaint, Count I asserts that Craighead and Ross, acting solely in their capacity as officers of the Company,[168] and motivated by "the immediate payouts associated with the Transaction" and their "desire not to lose their jobs upon a stockholder revolt following"[169] the failed Halliburton transaction, breached their fiduciary duties by:

> (1) approving the Transaction despite red flags regarding GE's financials; (2) deciding to continue with the Transaction after the receipt of the materially inferior Comparable GE O&G Audited Financial Statements . . . (3) failing to obtain a revised fairness opinion that took into account the Comparable GE O&G Audited Financial Statements; [and] (4) failing to request and take into account the goodwill impairment analyses that led to the recognition of the goodwill impairments.[170]

The oddity of Count I is that each of these contentions concern a *Board*-level decision to take action (or refrain from taking action) in connection with a sale of control of the Company where the independence and disinterestedness of twelve members of the Board (*i.e.*, all but Craighead) is unchallenged.[171]  They do not

---

make [various] false and misleading representations."  *Id.* ¶ 162.  This allegation is conclusory and does not speak specifically to the omission of the Unaudited Financials.

[168] *See* Pls.' Answering Br. 57 n.166, 64.

[169] Compl. ¶ 190.

[170] *Id.* ¶ 189.

[171] *See, e.g.*, 8 *Del. C.* § 251(b) (requiring that "the board of directors of each corporation which desires to merger or consolidate shall adopt a resolution approving an agreement of merger of consolidation").

concern decisions Craighead or Ross were authorized to make as officers. Nor does the Complaint allege that the Board was unaware in making these decisions that Craighead and Ross potentially stood to receive significant payments in connection with the Merger. Thus, even if Craighead and/or Ross were motivated to favor approval of the Merger for personal financial reasons, there is no reasonably conceivable set of facts pled in the Complaint that calls into question the decisions of an overwhelmingly independent and disinterested Board to approve and continue to support the Merger.[172]

Presumably recognizing as much, Plaintiffs recast the import of Count I in their brief. Plaintiffs argue there that Craighead and Ross breached their duty of loyalty by "turning a blind eye to red flags in GE O&G's Unaudited Financials" because they "knew that if they trained the Board's attention on the Audited Financials, or sought an updated fairness opinion from Goldman, they would jeopardize closing of the Merger and, with it, their payday."[173] Citing this court's decision in *In re El Paso Corporation Shareholder Litigation*,[174] Plaintiffs contend

---

[172] *See, e.g.*, *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11-12 (Del. Ch. Jan. 3, 2013) (finding "no reasonably conceivable set of facts" had been pled to support a claim that the board breached its fiduciary duties where one member who stood to receive a $9 million lump sum payment in connection with the challenged transaction was not alleged to have "exerted any undue influence over any of the seven other independent and disinterested members of the Board in their consideration of" an acquisition proposal).

[173] Pls.' Answering Br. 55-56.

[174] 41 A.3d 432 (Del. Ch. 2012) (Strine, C.).

that "Craighead's and Ross's elevation of self-interest over their duty to protect Baker Hughes stockholders from the unfair Merger constituted classic disloyalty under Delaware law and gives rise to paradigmatic *Revlon* claims."[175] The allegations in the Complaint do not support such a theory.

To be sure, Craighead and Ross potentially stood to receive significant payments in connection with the Merger—up to approximately $42 million for Craighead and $15.2 million for Ross.[176] Most of these amounts fall into one of three categories: (i) payments for restricted stock or restricted stock units granted before the date of the Merger Agreement that would vest upon closing—$12.2 million for Craighead and $5 million for Ross; (ii) cash severance if Craighead or Ross left the Company within two years after the closing—$12.1 million for Craighead and $6.1 million for Ross; and (iii) payments for restricted stock units granted after the date of the Merger Agreement that would vest if either of them left the Company within one year after closing—$9.4 million for Craighead and $3.5 million for Ross.[177]

---

[175] Pls.' Answering Br. 57.

[176] Compl. ¶¶ 23-24; Proxy at 125-27.

[177] Proxy at 125-27. In addition to cash severance and equity payments, Craighead received approximately $7.6 million as a tax reimbursement. *Id.* at 125, 128. To receive the cash severance or payments for restricted stock units granted after the date of the Merger Agreement, the executive's employment must be terminated during the relevant period by Baker Hughes without "cause" or by the executive for "good reason." *Id.* 125-26.

As to the first category, this court has found that accelerated vesting of equity awards in connection with a change of control transaction "does not create a conflict of interest because the interests of the shareholders and [fiduciaries] are aligned in obtaining the highest price."[178] By contrast, depending on their individual circumstances, the second two categories may have incentivized Craighead and Ross to favor a short-term change of control over the Company remaining independent, although that would mean foregoing substantial compensation they may have received if they remained in their positions in the post-Merger entity.[179] In 2016, for example, Craighead and Ross received a total of approximately $13.5 million and $5.8 million, respectively, in cash and stock compensation from Baker Hughes.[180]

Whether Craighead and Ross were financially motivated to favor the Merger ultimately is not the key issue raised by Count I to my mind. Rather, assuming they

---

[178] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("The vesting of options does not create a conflict as a high exchange ratio for ProNet shares benefits the option-holding directors as much as, if not more than, the regular stockholders."); *See also Novell*, 2013 WL 322560, at *11 ("[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law.").

[179] *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *9 (Del. Ch. Oct. 13, 2011) ("allegations of pecuniary self-interest must allow the Court to infer that the interest was of a sufficiently material importance, in the context of the [fiduciary]'s economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest.") (internal quotation marks omitted).

[180] Compl. ¶¶ 24, 49; Jackson Aff. Ex. J (Schedule 14A of Baker Hughes, dated March 9, 2017), at 37.

were so motivated, the relevant question is: Does the Complaint plead facts to support a reasonably conceivable claim that Craighead or Ross tainted the decision-making of twelve concededly independent and disinterested directors when the Board unanimously approved the Merger Agreement and continued to support the Merger after receiving the Audited Financials? In my opinion, the Complaint does not come close to doing so.

The *El Paso* decision on which Plaintiffs rely shows how far removed the allegations of the Complaint here are from stating a claim on the theory they have espoused. In *El Paso*, the court found that plaintiffs had demonstrated a reasonable likelihood of success in proving that a proposed merger of El Paso Corporation and Kinder Morgan, Inc. was "tainted by disloyalty."[181] In reaching this conclusion, the court found that El Paso's CEO and "sole negotiator" did not disclose to the El Paso board "his interest in working with other El Paso managers in making a bid to buy [El Paso's exploration and production] business from Kinder Morgan."[182] As the court elaborated:

> [The CEO] kept that motive secret, negotiated the Merger, and then approached Kinder Morgan's CEO on two occasions to try to interest him in the idea. In other words, when El Paso's CEO was supposed to be getting the maximum price from Kinder Morgan, he actually had an interest in not doing that.[183]

---

[181] *El Paso*, 41 A.3d at 434.

[182] *Id.* at 434, 436.

[183] *Id.* at 434.

The CEO's "undisclosed conflict of interest compounded the reality that the Board and management of El Paso relied in part on advice given by a financial advisor" that owned 19% of Kinder Morgan's stock, controlled two Kinder Morgan board seats, and whose lead banker "did not disclose that he personally owned approximately $340,000 of stock in Kinder Morgan."[184]

*El Paso* is one of a number of decisions where this court has sustained claims where fiduciaries tainted the board's approval of a transaction by concealing material information from the board about the transaction,[185] failing to disclose conflicts to the board,[186] or misleading the board to benefit a favored suitor.[187] None of those circumstances are pled here.

---

[184] *Id.*

[185] *See McElrath on behalf of Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at *10 (Del. Ch. Apr. 1, 2019) ("At this pleading stage, I must accept the Plaintiff's assertion that [CEO] was aware that the Otto transaction would result in misappropriation of IP from Google, but that he did not inform the Board in either his capacity as an officer of Uber or as a director. Withholding such information would be a violation of [the CEO's] fiduciary duty of loyalty as an officer of Uber."), *aff'd sub nom. McElrath v. Kalanick*, 224 A.3d 982 (Del. 2020).

[186] *See City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 724 (Del. 2020) (sustaining claim against CEO where "Plaintiffs have alleged sufficiently that [CEO] was materially interested in the merger, that he failed to disclose his interest in the Proposal to the Towers Board, and that a reasonable Board member would have regarded the existence of [CEO's] material interest a significant fact in the evaluation of the merger.").

[187] *See Chen v. Howard-Anderson*, 87 A.3d 648, 687 (Del. Ch. 2014) ("Here . . . the plaintiffs have cited evidence regarding actions that [defendants] took as officers that could support a reasonable inference of favoritism towards [a bidder] consistent with their personal financial interests rather than the pursuit of maximal value for the stockholders."); *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) (finding allegations that an officer, for

51

As previously discussed, the Complaint does not allege that the Board was unaware that the Company's CEO and CFO stood to receive significant payments in connection with the Merger—a routine reality of M&A transactions. Nor does the Complaint contain any well-pled facts demonstrating that Craighead or Ross withheld from the Board any other potential conflict of interest they had with respect to the Merger or that they deprived the Board of any material information that could have corrupted the Board's decision-making in connection with its consideration of the Merger.

Plaintiffs' suggestion that Craighead and Ross failed to "train[] the Board's attention on the Audited Financials," at bottom, is speculative and of no moment.[188] The Complaint does not allege that Craighead or Ross (or anyone else) concealed the Audited Financials from the Board, which was well-equipped—with the assistance of sophisticated legal and financial advisors—to assess whether the Audited and Unaudited Financials differed materially so as to trigger the termination right under the Merger Agreement. Indeed, as the Complaint acknowledges, the

_____

personal financial reasons, "never responded to" a bidder's "due diligence requests and that as a result," the bidder "withdrew a competitive bid for" the corporation sufficient to survive a motion to dismiss).

[188] Pls.' Answering Br. 56.

Proxy expressly disclosed that Baker Hughes determined that the termination right was not available after reviewing the Audited Financials.[189]

In effect, Plaintiffs' grievance is that Craighead and Ross did not pound on the table vigorously enough to persuade twelve concededly independent and disinterested Board members to reach a different conclusion concerning the import of the Audited Financials. Plaintiffs cite no authority to support such a claim and the court is aware of none. In sum, devoid of any well-pled allegations that Craighead or Ross mislead or concealed material information from the Baker Hughes Board that tainted their consideration of the Merger, the Complaint fails to plead a reasonably conceivable claim that they breached their duty of loyalty as officers of the Company with respect to the Board's decision to approve the Merger.[190] Accordingly, Count I is dismissed for failure to state a claim.

---

[189] Compl. ¶ 155 (quoting Proxy at 28).

[190] Plaintiffs argue, in a footnote, that "[e]ven if the Court were to find that Craighead and Ross were not interested in the Merger, their failure to take any action upon receipt of the Audited Financials . . . still would constitute a breach of the duty of care for which they were not exculpated in their capacities as executive officers." Pls.' Answering Br. 57 n.166. The court disagrees. The Complaint does not plead facts sufficient to demonstrate that Craighead or Ross were grossly negligent, *i.e.*, that they acted with reckless indifference or without the bounds of reason with respect to the Company's decision not to terminate the Merger Agreement based on differences between the Unaudited and Audited Financials.

## IV. CONCLUSION

For the reasons explained above, the court grants the motions to dismiss Counts I, III, and IV of the Complaint, and grants in part and denies in part the motion to dismiss Count II of the Complaint. The parties should confer and submit an implementing order within five business days.

**IT IS SO ORDERED.**